J-S34002-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: K.R.D., II, A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.R.D., SR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 728 WDA 2024 |

Appeal from the Order Entered June 6, 2024
In the Court of Common Pleas of Greene County Orphans' Court at
No(s): 9 O.A. of 2024

| | | |
|---|---|---|
| IN RE: ADOPTION OF: K.R.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.R.D., SR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 729 WDA 2024 |

Appeal from the Order Entered June 6, 2024
In the Court of Common Pleas of Greene County Orphans' Court at
No(s): 10 O.A. of 2024

BEFORE: DUBOW, J., LANE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY DUBOW, J.:                    **FILED: December 20, 2024**

K.R.D., Sr. ("Father") appeals from the June 6, 2024 order entered in

the Greene County Court of Common Pleas that terminated his parental rights

---

[*] Former Justice specially assigned to the Superior Court.

to four-year-old K.R.D. and three-year-old K.R.D., II (collectively, "Children").[1] Upon review, we affirm.

Children's parents, Father and H.S. ("Mother") (collectively, "Parents"), were never married and have a history of substance abuse and incarceration. In May of 2021, shortly after K.R.D., II's birth, the Greene County Children and Youth Services (the "Agency") obtained emergency custody of Children until August 11, 2022, when the Agency reunited Children with Mother. However, in February of 2023, the Agency once again obtained custody of Children and placed them in kinship care with Mother's cousin and his spouse ("Kinship Parents").[2] The court ordered parents to participate in drug and alcohol evaluation and treatment, obtain safe and appropriate housing, complete parenting classes, and participate in Family Reunification Services.

Father has been incarcerated for most of the time that Children have been in placement due to a conviction for Driving Under the Influence of drugs and related charges. Father was free from incarceration from April to August of 2022 and from December of 2023 to April of 2024.

During the period from April to August of 2022, the Agency placed Children in the home of their paternal grandmother ("Paternal Grandmother") where Appellant also resided. Father claimed that, during this four-month

---

[1] The court also terminated the parental rights of Children's mother, H.S., who is not a party to this appeal.

[2] The record reflects that Parents have a history of substance abuse but does not reveal the specific reasons that Children were removed from Parents' care twice.

period, he assisted Paternal Grandmother in caring for Children. In December of 2023, Father was released to court-ordered transitional housing, or a "three-quarter house." Father absconded from the transitional housing and went into hiding for several months, which prompted authorities to issue a bench warrant for and, eventually, re-arrest Father. On April 20, 2024, Father was re-incarcerated with an anticipated release date of February 2025.

Since February of 2023 when Children were placed in kinship care for the second time, Father has only attended one visitation with them that was arranged by the Agency. Father never requested visitation during his periods of incarceration. Father failed to send cards, gifts, or letters to Children while they were in placement. Likewise, Father failed to provide any financial support to Children. Further, Father did not provide any documentation to the Agency that he completed court-ordered services and failed to attend any permanency review hearings while Children were in placement.

On February 23, 2024, the Agency filed a petition to terminate Father's parental rights. The court appointed Mark Kovach, Esq., to serve as Children's legal counsel. On May 9, 2024, the court held a hearing. The Agency presented testimony from case manager Jessica Welsh. Father testified on his own behalf.

Ms. Welsh testified in accordance with the above-stated facts. Additionally, Ms. Welsh testified that Children were doing "very well" in Kinship Parents' home and that they are "comfortable, they're happy, [and] their needs are being met." N.T. Hearing, 5/8/24, at 24. Ms. Welsh testified that it

would be in Children's best interest to terminate Father's parental rights because Children "are very young, and they need stability, they need consistency, they need parents who are – are involved and are – who are free from drugs and alcohol. They shouldn't have to live out their childhood in the court system." *Id.* at 10. Ms. Welsh stated that she did not believe Children would suffer any detrimental or negative effects if Father's parental rights were terminated.

Father testified that from April to August 2022 he was paroled to the home of his grandmother, where his Children were placed at the time. He further testified that he watched Children when his grandmother was not home, he helped transport Children to visits with Mother, and Children slept with him. Father also testified that he bought Children diapers, clothes, and food during that period until he was reincarcerated.

Father stated that he received drug and alcohol treatment when he was incarcerated at both SCI Fayette and SCI Laurel Highlands. Father testified that in December 2023, he was paroled to Renewal, a "three-quarter house," and that he was there for three-weeks prior to absconding. Father testified that the house was "in the middle of downtown Pittsburgh [and] drug infested" so he left. *Id.* at 35. Father explained that he was currently incarcerated at SCI Smithfield and expected to be released in February 2025. Father testified that he has housing lined up upon his release from prison, which is a three-bedroom duplex that he would be renting and that he would be able to obtain

employment with Railroad Construction. Father further testified that he wants Children to live with him.

Father testified that while he was incarcerated at SCI Laurel Highlands, he received a letter from the Agency stating that it would set up monthly visits for him and that he should not contact Children directly at the kinship care home. Father admitted that he did not send Children gifts, cards, or make phone calls to them because the letter instructed him not to, and he did not understand that he could send letters, cards, and gifts to the Agency for Children. Father explained that the Agency never set up the monthly visits for him to see Children while he was in prison.

Father expressed his desire to have monthly visitation with the Children, complete necessary classes to reunify with Children, and provide them with a permanent home when he is released from prison in February 2025.

When counsel asked Father if the barrier to reunification with Children was the fact that the Agency did not arrange monthly visitation, Father testified, "No. The barrier is myself." *Id.* at 45. Father further testified:

> I have – have not been in the right state of mind. I have not been out of addiction. I have not been out of incarceration or not on parole until now, until I have – I've gained a place for myself to parole to. I've never had a secure address to live at that's safe enough for myself, let alone my two children, but I do now. Now I have somewhere to go. Now I have employment. Now I don't have to rely on nobody else but myself. If only I could be granted the same opportunity that every other parent has been granted, and not just nothing over three years of incarceration.

*Id.*

Finally, Father testified that he "absolutely" had a bond with Children. Father testified:

> I've been with [K.R.D., II] since – since he was born, at my grandmother's, basically, besides the first year. . . . And K.R.D.'s my – she's my little girl. She's my pride and joy, you know. She used to sleep on my chest every single day. That's my daughter. How could you not have a bond or relationship with your child?

*Id.* at 57. Father also testified that he loves his Children and wants to maintain his parental rights. Finally, he testified that he would have "definitely done something different" if he knew that "my time not being present in [C]hildren's lives" would lead to his rights being involuntarily terminated. *Id.* at 61.

On June 6, 2024, the trial court terminated Father's parental rights to Children pursuant to 23 Pa.C.S. §§ 2511(a)(1), (2), (5), (8), and (b).

Father timely appealed. Both Father and the trial court complied with Pa.R.A.P. 1925.

Father raises the following issue for our review: "Was clear and convincing evidence presented to show that termination was warranted pursuant to [23 Pa.C.S. §§ 2511(a)(1), (2), (5), (8), and (b)]? Father's Br. at 5.

**A.**

In cases involving the involuntary termination of parental rights, this Court's review is limited to determining whether the trial court's conclusion is supported by competent evidence. *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021). When we review a trial court's decision to grant or deny a

petition to involuntarily terminate parental rights, we must accept the findings of fact and credibility determinations of the trial court if the record supports them. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id*. (citation omitted). "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (citation omitted).

We may not reverse merely because the record could support a different result. *T.S.M.*, 71 A.3d at 267. We give great deference to the trial courts "that often have first-hand observations of the parties spanning multiple hearings." *Id.* Moreover, "[t]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

It is axiomatic that "[p]arents enjoy a fundamental right to make decisions regarding the care, custody[,] and control of their children." *L.A.K.*, 265 A.3d at 591. "It cannot be denied that significant and permanent consequences for both the parent and child can follow the termination of parental rights, as there is an undeniable importance in a child's relationship with a biological parent." *Id.*. Accordingly, "[i]n recognition of the gravity attendant to the termination of parental rights, the moving party must

- 7 -

establish the statutory grounds by clear and convincing evidence; that is, evidence that is so clear, direct, weighty and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* at 592 (citations and quotation marks omitted).

Section 2511 of the Adoption Act, 23 Pa.C.S. § 2511, governs termination of parental rights, and requires a bifurcated analysis. *In re Adoption of A.C.*, 162 A.3d 1123, 1128 (Pa. Super. 2017). "Initially, the focus is on the conduct of the parent." *Id.* (citation omitted). As discussed above, "[t]he party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a)." *Id.* (citation omitted). If the court determines that the parent's conduct warrants termination of his or her parental rights, the court then engages in "the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." *Id.* (citation omitted).

Notably, our Supreme Court has held that "[n]either subsection (a) nor (b) requires a court to consider the reasonable efforts provided to a parent prior to termination of parental rights." *In re D.C.D.*, 105 A.3d 662, 672 (Pa. 2014). As our High Court explained, denying termination for that reason would only "punish an innocent child" rather than promote the child's best interests. *Id.* at 675. Moreover, we need only agree with the court's decision as to any one subsection of Section 2511(a), as well as Section 2511(b), to

affirm the termination of parental rights. *In re K.Z.S.*, 946 A.2d 753, 758 (Pa. Super. 2008). We concentrate our analysis on subsection 2511(a)(1).

Section 2511(a)(1) provides that the trial court may terminate parental rights if the Petitioner establishes that "[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." 23 Pa.C.S. § 2511(a)(1). The focus of involuntary termination proceedings is on the conduct of the parent and whether that conduct justifies a termination of parental rights. *In re B.L.L.*, 787 A.2d 1007, 1013 (Pa. Super. 2001). Although the statute focuses on an analysis of the six months immediately preceding the filing of the petition, the court must consider the whole history of a given case and may consider a parent's inaction before the six-month statutory provision. *K.Z.S.*, 946 A.2d at 758. "Although courts are to avoid the mechanical application of the Adoption Act, we may not ignore that the General Assembly has drawn focus to the six months immediately preceding the filing of the termination petition [and] the most critical period for evaluation is the six months immediately preceding the filing of the termination petition." *L.A.K.*, 265 A.3d at 592.

This Court has repeatedly defined "parental duties" in general as the affirmative obligation to provide consistently for the physical and emotional needs of a child:

Parental duties are not defined in the Adoption Act, but our courts long have interpreted parental duties in relation to the needs of a child, such as love, protection, guidance and support. Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship. The roster of such positive actions undoubtedly includes communication and association. The performance of parental duties requires that a parent exert himself to take and maintain a place of importance in the child's life. Fortitude is required, as a parent must act with reasonable firmness to overcome obstacles that stand in the way of preserving a parent-child relationship and may not wait for a more suitable time to perform parental responsibilities.

*Id.* (internal citations and quotation marks omitted).

It is well-settled that "a parent's efforts are always considered in light of existing circumstances." *Id.* (citations and internal quotation marks omitted). "To that end, even where the evidence clearly establishes a parent has failed to perform affirmative parental duties for a period in excess of six months as required by Section 2511(a)(1), the court must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination of parental rights." *Id.* at 593 (citations and internal quotation marks omitted).

Our Supreme Court has explained:

Consideration of the totality of the circumstances includes evaluation of the following: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between the parent and child, if any, including any efforts made by the parent to reestablish contact with the child; and (3) the effect that termination of parental rights would have on the child pursuant to Section 2511(b). . . . It is within this framework that a court determines whether a parent has faced barriers that prevented the parent from maintaining the parent-child relationship. What constitutes a "barrier" in the context of a Section 2511(a)(1)

- 10 -

analysis is a finding within the discretion of the trial court, and what may constitute a barrier necessarily will vary with the circumstances of each case.

*Id.*

**B.**

Father avers that the Agency failed to present clear and convincing evidence that Father's "actions expressed a settled purpose of relinquishing a parental claim to [C]hildren or refusal to perform any parental duties." Father's Br. at 13. On the contrary, Father argues that his words and actions indicate a desire to reunify with Children. Father notes that he participated in the drug and alcohol programs that were offered to him in prison, and that he wanted to maintain contact with Children but reasonably believed that he was not allowed to contact Children directly due to a letter he received from the Agency. The crux of Father's argument, however, is that the Agency never set up visitation for him while he was incarcerated. *Id.* at 15. Essentially, Father argues that the Agency failed to make reasonable efforts to reunify him with Children.

Father's argument lacks merit because, as noted above, "[n]either subsection (a) nor (b) requires a court to consider the reasonable efforts provided to a parent prior to termination of parental rights." *D.C.D.*, 105 A.3d at 672. The trial court did not find Father's testimony credible that he engaged in drug and alcohol treatment or that he had stable housing and employment available upon release from prison. Moreover, the court found that Father did not take affirmative steps to reunify with Children. The court opined:

- 11 -

> Even at the time of the hearing, [F]ather had no clear, credible plan for the future as to his involvement in the life of [Children]. While taking a modicum of responsibility, his focus on blaming others, having no clear plan, and still not addressing the circumstances which led to removal, the Court does not have any faith that waiting or delaying would be fruitful.

Trial Ct. Op., 6/6/24, at 6 (unpaginated).

The trial court emphasized that, in the six months preceding the filing of the termination petition, Father was released from incarceration but chose to abscond from his three-quarter house and go into hiding for four months, which resulted in his re-arrest and a longer prison sentence. The court opined that Father's actions "indicate[] that [F]ather continues to value his selfish interests over the interests of his Child[ren]. Father believes he will be released in February of 2025 and has a max date of May [of 2025]. Potentially, another full year in the life of the [Children] where Father is incarcerated." *Id.* The court credited Father's own testimony that he is the barrier to reunification to conclude that Father "failed to perform parental duties" and has "generally neglected" Children. *Id.* at 6-7.

Our review of the record supports the trial court's findings. We decline to usurp the court's credibility determinations or reweigh the evidence. The record reveals that Father failed to perform parental duties for the six months immediately preceding the filing of the termination petition, as well as throughout the life of the case. Notably, Father was released from prison in December of 2023, and instead of taking action to preserve his parent-child relationship with Children, he absconded from his three-quarter house and went into hiding. It is well-settled that a parent may not wait for a more

- 12 -

suitable time to perform parental responsibilities. Father testified that the barrier to reunification with Children is himself and his actions, and the trial court agrees. We conclude that the trial court did not abuse its discretion when it terminated Father's parental rights pursuant to Section 2511(a)(1).

**C.**

With respect to Section 2511(b), our analysis focuses on the effect that terminating the parental bond will have on the child. This Court reviews "whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010). It is well settled that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005).

"One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond" that the child has with the parent, with close attention paid to the effect on the child of permanently severing any such bond." *In re Adoption of N.N.H.*, 197 A.3d 777, 783 (Pa Super. 2018) (citation omitted). The fact that a child has a bond with a parent does not preclude the termination of parental rights. *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014). Rather, the trial court must examine the depth of the bond to determine whether the bond is so meaningful to the child that its termination would destroy an existing, necessary, and beneficial relationship. *Id.* at 898. Moreover, the trial court may consider intangibles, such as the

love, comfort, security, and stability the child might have with the adoptive resource. *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011). Ultimately, the concern is the needs and welfare of the child. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). Notably, "in cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re Q.R.D.*, 214 A.3d 233, 243 (Pa. Super. 2019) (citation omitted)

Father avers that the trial court erred when the court found that termination of parental rights was in Children's best interest. Father's Br. at 27. Father argues that the Agency failed to call an expert witness to discuss whether there is a bond between Father and Children. *Id.* at 29. Father further argues that the Agency solely relied upon the testimony of the casework supervisor, who failed to present evidence regarding her observations of the Appellant's interactions with Children. *Id.* at 29-30. Accordingly, Father argues that the Agency failed to demonstrate that termination of Father's parental rights was in Children's best interest. We disagree.

It is well settled that Section 2511(b) does not require a formal bonding evaluation or expert testimony. *Z.P.*, 994 A.2d at 1121. Rather, social workers and caseworkers can offer their opinions. *Id.* Moreover, as discussed above, "in cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists." *In re Q.R.D.*, 214

A.3d at 243. Instantly, Children are both young and Father has only visited with them one time in the last year. The Agency did not present evidence of interactions between Father and Children because very little interaction occurred. Accordingly, it is reasonable for the trial court to infer that no bond exists. Moreover, the trial court credited Ms. Welsh's testimony that termination of parental rights would be in Children's best interest and that Children would not suffer detrimental effects. The court opined:

> Whatever minimal relationship [Children have] had with [F]ather, it is clear that permanency for [Children] is necessary and permanency with [F]ather is extremely unlikely to occur within any reasonable amount of time. The [c]ourt concludes that it would be in [Children]'s best interests, and serve [their] needs and welfare, to have the parental rights of [F]ather terminated so that [they] can have a family relationship that has been lacking with [F]ather.

Trial Ct. Op. at 7. The record supports the trial court's findings and, thus, we discern no abuse of discretion. As always, we decline to reweigh the evidence or usurp the trial court's credibility findings.

In conclusion, our review of the record supports the trial court's findings. We discern no error of law or abuse of discretion with respect to the trial court's conclusion that the Agency presented clear and convincing evidence to terminate Mother's parental rights pursuant to Section 2511(a)(1) and (b) and Father's parental rights pursuant to Section 2511(a)(1) and (b). In light of our disposition, we decline to address Father's additional arguments as they relate to other subsections of Section 2511.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 12/20/2024